UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Boston Scientific SciMed, Inc., and
Boston Scientific Corporation,

       Plaintiffs,

v.                                                                                                     Civ. No. 05-651 (JNE/JSM)
                                                                                                       ORDER
ev3 Inc.,

       Defendant.

Kevin M. Flannery, Esq., and Robert D. Rhoad, Esq., Dechert LLP, and Paul J. Robbennolt, Esq., Dorsey & Whitney LLP, appeared for Boston Scientific SciMed, Inc., and Boston Scientific Corporation.

Martin R. Lueck, Esq., and Jacob M. Holdreith, Esq., Robins Kaplan Miller & Ciresi LLP, appeared for ev3 Inc.

Boston Scientific SciMed, Inc., and Boston Scientific Corporation (collectively, Boston Scientific) brought this action against ev3 Inc. alleging claims of patent infringement. ev3 brought counterclaims for patent infringement and declaratory judgment of invalidity, unenforceability, and non-infringement. The case is before the Court on the parties' request for construction of disputed claim terms pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

## I.  BACKGROUND

This case involves medical device technology relating to "embolic protection," which generally involves the capture and removal from the bloodstream of debris that is dislodged during a medical procedure, such as angioplasty, the placement of a stent, or atherectomy. Nine patents are at issue in this case. Boston Scientific owns the patent rights to U.S. Patent Nos.

6,027,520 ('520 Patent); 6,652,505 ('505 Patent); 6,142,987 ('987 Patent); 6,872,216 ('216 Patent); 6,676,682 ('682 Patent); and 6,663,652 ('652 Patent). ev3 owns the patent rights to U.S. Patent Nos. 6,949,103 ('103 Patent); 6,989,019 ('019 Patent); and 7,033,375 ('375 Patent). Each patent-in-suit describes a device, or a device and method, for filtering loose embolic material from bodily fluids.

## II.   DISCUSSION

### A.   Claim construction principles

Patent claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Proper claim construction requires an examination of the intrinsic evidence of the record, including the claims, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). The starting point for claim construction is a review of the words of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006); *Vitronics*, 90 F.3d at 1582 ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). The words of a claim are generally given their ordinary and customary meaning—the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13. The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but also in the context of the entire patent. *Id.* The claims must be read in view of the specification, which is always highly relevant to claim construction. *Id.* at 1315. The specification may provide a special definition given to a claim term or a disavowal of claim scope by the inventor. *Id.* at 1316. Generally, however, the court should not import limitations

found only in the specification. *Id*. at 1323. The line between using the specification to interpret the meaning of a claim and importing limitations into the claim can be difficult to discern, but can be approached with reasonable certainty if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. *Id.* The court should also consider the patent's prosecution history, which provides evidence of how the United States Patent and Trademark Office and the inventor understood the patent. *Id.* at 1317. The court, in its discretion, may also consider extrinsic evidence, though it is less reliable than intrinsic evidence. *Id*. at 1317-18. In most situations, however, intrinsic evidence will resolve any ambiguity in a disputed term, and it is improper to rely on extrinsic evidence when intrinsic evidence does so. *Vitronics*, 90 F.3d at 1583.

**B.     Claim terms resolved during the *Markman* hearing**

During the *Markman* hearing, the Court construed many of the disputed claim terms. For the reasons stated on the record and those briefly discussed below, the Court construes the following claim terms.

*1.     Boston Scientific's '520 Patent*

*a.     "filter"*

ev3 proposes that the term "filter" be construed consistently across all patents-in-suit and given its plain and ordinary meaning as a "device for separating suspended particulate matter from liquid that can be made from a variety of materials." Boston Scientific argues that the term "filter" is used in an ordinary, generic fashion in the Boston Scientific patents-in-suit and need not be construed. Because the Court discerns no ambiguity as to the meaning of the term "filter"

and because "filter" is readily understood, the Court declines to construe the term as it is used in the '520 Patent.[1]

### b. "region of interest"

ev3 seeks a construction that would limit the term "region of interest" to "the lesion or stenotic portion of the vessel that is being treated—*i.e.*, the portion of a vessel that has been narrowed by disease." Boston Scientific, on the other hand, argues that the term should be construed as the "area within the patient's vessel where a medical treatment procedure is to be performed." Neither party disputes that the term "region of interest" refers to a fixed location.

The term "region of interest" appears in several claims of the '520 Patent. There is no indication in the intrinsic evidence that the term "region of interest" should be limited strictly to the lesion or stenotic portion of the vessel being treated. Instead, the Court construes "region of interest" as the "location of a percutaneous procedure to be performed within a patient's vessel."[2]

### c. "deploying the filter" and "filter . . . deployment capabilities"

The phrases "deploying the filter" and "filter . . . deployment capabilities" appear in independent claim 1 and the preamble to independent claim 9, respectively. Boston Scientific proposes that the phrases be construed as "expansion of the filter from a smaller collapsed size to a larger open size" and "the ability to have the filter expand from a smaller collapsed size to a larger open size," respectively. ev3 argues that the phrases mean "manually releasing or manually expanding the filter by some additional action after and in addition to uncovering a filter."

---

[1] Likewise, the Court declines to construe the term "filter" in all of the Boston Scientific patents-in-suit and will not address the term in each patent separately.

[2] This construction also applies to the term "region of interest" in the '987 and '505 Patents.

There is no indication in the context of the claim language or elsewhere in the intrinsic evidence that the phrases "deploying the filter" or "filter . . . deployment capabilities" require manual action. The Court therefore construes "deploying the filter" and "filter . . . deployment capabilities," respectively, as "expanding the filter from a smaller collapsed size to a larger open size" and "the ability to have the filter expand from a smaller collapsed size to a larger open size."

                *d.*      *"stent-deployment catheter"*

The term "stent-deployment catheter" appears in claims 1, 2, and 4. ev3 proposes that this term be construed as "a catheter for supporting and delivering a stent. The catheter may or may not include a balloon and the catheter may or may not include a stent." Boston Scientific has not proposed an alternative construction. There is no intrinsic evidence supporting the second part of ev3's proposed construction. The Court therefore construes "stent-deployment catheter" as "a catheter for supporting and delivering a stent."[3]

                *e.*      *"system"*

The term "system" appears in several claims of the '520 Patent. Independent claim 9 recites "[a] percutaneous system having filter and stent deployment capabilities." Boston Scientific argues that the term "system" is unambiguous and self-explanatory and that it needs no further construction. ev3 proposes that the phrase "percutaneous system" be construed as "a complete medical procedure system including a particular filter and stent specifically designed to operate cooperatively as a system and which are provided as a complete assembly by a single manufacturer."

---

[3]    This construction also applies to the term "stent-deployment catheter" in the '987 Patent.

There is no intrinsic evidence to support ev3's suggestion that the filter and stent must be specifically designed to operate cooperatively or that the components must be provided together by a single manufacturer. The Court therefore construes "system" as "a medical procedure system wherein the components operate cooperatively with each other."[4]

      *f.*    *"wherein, during use"*

The phrase "wherein, during use" appears in independent claim 9. Boston Scientific asserts that the phrase is unambiguous and needs no further explanation. ev3 proposes that the phrase be construed as "[a] user, such as an interventional cardiologist, positions the guidewire across the portion of the vessel that has been narrowed by disease, manually expands the filter and deploys the stent in the portion of the vessel that has been narrowed by disease, removes the catheter from the vessel, and leaves the stent in place."

ev3's proposed limitations on "wherein, during use" conflict with the Court's previous construction of the phrases "deploying the filter" and "filter . . . deployment capabilities" as not requiring manual action. In addition, the phrase "wherein, during use" is readily understood. Therefore, the Court declines to construe the phrase.[5]

    2.    *Boston Scientific's '682 Patent*

      *a.*    *"strut"*

The term "strut" appears in the '682 Patent. Boston Scientific proposes that the term "strut" be construed as "a component that braces the filter." At the *Markman* hearing, ev3 indicated that it would be content to bring a summary judgment motion for invalidity if the Court

---

[4]    This construction also applies to the term "system" in the '987 and '505 Patents.

[5]    Similarly, the Court declines to construe the phrase "wherein, during use" in the '987 and '505 Patents.

6

were inclined to accept Boston Scientific's proposed construction. The Court construes "strut" as "a component that braces the filter."

        b.      *"strut disposed in a radially asymmetric pattern"*

The term "strut disposed in a radially asymmetric pattern" appears in the '682 Patent. The Court construes this phrase as "strut positioned on the guidewire in a manner that is not symmetric about the guidewire."

        c.      *"an obtuse angle is formed between the strut and the guidewire"*

The phrase "an obtuse angle is formed between the strut and the guidewire" appears in the '682 Patent. The Court construes this phrase as "an angle of more than 90 degrees and less than 180 degrees formed between the strut and the guidewire."

        3.      *Boston Scientific's '216 Patent*

        a.      *"wire loop"*

The term "wire loop" appears in claim 1. Boston Scientific argues that the term is unambiguous and needs no further construction. ev3 proposes that the term be construed as "a loop or a hoop-shaped frame that maintains the filter mouth in an open position and defines the mouth of the filter." After reviewing the intrinsic evidence, and the prosecution history in particular, the Court declines to construe the term "wire loop."

        b.      *"coupled"*

The term "coupled" appears in claim 1. Boston Scientific proposes that the term be construed as "directly or indirectly linked." ev3 argues that "coupled" should be construed as "the filter must be directly attached to the wire and not be attached to a tube that rides on the wire." After reviewing the intrinsic evidence, and the prosecution history in particular, the Court construes "coupled" as "adjacent and directly connected to."

7

    *c.*  *"eccentrically coupled"*

The term "eccentrically coupled" appears in claim 1.  Boston Scientific argues that the term should be construed as "not concentrically coupled (with respect to the elongate member)." ev3 asserts that "eccentrically coupled" should be construed as "residing eccentrically about something to which the object is directly attached."  The Court declines to construe the term "eccentrically coupled."

    *4.*  *Boston Scientific's '652 Patent*

    *a.*  *"transversely extending protrusion"*

The phrase "transversely extending protrusion" appears in claim 1.  Boston Scientific argues that the phrase should be construed as "a protrusion that extends in the radial direction, *i.e.*, crosswise to the long axis of the elongate member."  ev3 proposes that the phrase be construed as "a protrusion that expands outward from the guidewire in a direction perpendicular and crosswise to the guidewire."

Neither party disputes that the phrase "transversely extending protrusion" has no accepted meaning within the art.  Because the phrase is not defined explicitly or implicitly in the intrinsic evidence, the Court turns to the ordinary meaning of the words.  The Court construes "transversely extending protrusion" as "a protrusion that extends crosswise to the long axis of the elongate member."

    *b.*  *"limits"*

The term "limits" appears in claim 1.  Boston Scientific proposes that "limits" be construed as "restricts within bounds."  ev3 does not propose an alternative construction.  The Court construes "limits" as "restricts within bounds."

8

5. *Boston Scientific's '987 Patent*

   a. *"expanding the filter"*

The phrase "expanding the filter" appears as part of a separate method step in claim 1. In pertinent part, claim 1 provides "[a] method for deploying a percutaneous medical instrument, comprising steps of: . . . expanding the filter downstream of the region of interest." Boston Scientific proposes that the phrase "expanding the filter" is readily understandable and needs no further construction. ev3 argues that the phrase should mean "expanding the filter by some additional action after and in addition to withdrawing the sheath." The Court declines to insert a limitation requiring manual action into the phrase "expanding the filter" and concludes that the phrase need not be construed.[6]

   b. *"balloon catheter"*

The term "balloon catheter" appears in claims 7 and 12. ev3 proposes that the term be construed as "a catheter that includes a balloon. A balloon catheter may or may not include a stent." Boston Scientific has not proposed an alternative construction. There is no intrinsic evidence supporting the second part of ev3's proposed construction. The Court therefore construes "balloon catheter" as "a catheter that includes a balloon."[7]

   c. *"reaches"*

The term "reaches" appears in several claims of the '987 Patent. ev3 argues that the term should be construed as "is within or beyond." Boston Scientific argues that the term is easily understood and need not be construed. The Court construes "reaches" as "is within or beyond."[8]

---

[6]  Likewise, the phrase "expanding the filter" in the '505 Patent need not be construed.

[7]  This construction also applies to the term "balloon catheter" in ev3's '103 and '375 Patents.

[8]  This construction also applies to the term "reaches" in the '505 Patent.

9

   *6.*  *ev3's Patents*

The phrase "removing restraint on balloon filter" appears in both the '019 and '375 Patents. Boston Scientific argues that the phrase should be construed as "moving the restraining element so as to uncover the filter at the desired location." ev3 suggests that the phrase need not be construed, but to the extent it is to be construed, it should mean nothing more "than that the filter element be outside the lumen of the sheath and permitted to expand to its expanded configuration." The Court declines to construe "removing restraint on filter element" because the phrase is easily understood.

## C. Remaining claim terms

During the *Markman* hearing, the Court did not construe the terms "wire guide" as used in Boston Scientific's '987 Patent, "mounted on" as used in Boston Scientific's '987 and '505 Patents,[9] and "filter" or "filter element" as used in the ev3 patents-in-suit. The Court now turns to the construction of those terms.

   *1.*  *"wire guide" and "wire guide mounted on the distal region"*[10]

Boston Scientific argues to the extent that construction is warranted, the Court should construe "wire guide" as "a tube or other component with an aperture designed to engage the guidewire and track the support wire along the guidewire." Boston Scientific also seeks to construe the phrase "mounted on" as "assembled on for use together with." ev3 seeks to

---

[9] Because the '987 and '505 Patents are related and share many common terms, the Court interprets the claims consistently. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

[10] The term "wire guide" appears in several claims of the '987 Patent, and the term "mounted on" appears in both the '987 and '505 Patents. With respect to the term "mounted on," the parties' dispute centers on the relationship between the wire guide and the support wire. Therefore, the Court focuses on the construction of the term "wire guide" and the phrase "wire guide mounted on the distal region."

construe "wire guide mounted on the distal region" as follows: "A part attached at a fixed position to the support wire that has an opening for another wire to pass through so the other wire can lead the support wire to a location. The wire guide is not a separate sheath or rapid exchange catheter, nor is it an opening in a separate catheter or sheath."

Both parties acknowledge that the term "wire guide" has no established meaning in the art. The Court first consults the claim language and the remainder of the specification to discern what a person of ordinary skill in the art would have understood the term to mean. *See Phillips*, 415 F.3d at 1314. Relevant portions of the claim language of the '987 Patent read:

> 1. A method for deploying a percutaneous medical instrument, comprising the steps of:
> providing a guidewire and a support wire, the support wire having a distal region, a wire guide mounted on the distal region, and an expandable filter mounted on the distal region; . . . advancing the support wire along the guidewire with the wire guide of the support wire engaging the guidewire;
> . . . .
>
> 6. The method of claim **1**, wherein the wire guide comprises a ring having an aperture adapted to receive the guidewire.
> . . . .
>
> 19. A percutaneous filter system, comprising: . . . a wire guide mounted on the distal region of the support wire and slideably engaging the guidewire,
> . . . .
> . . . .
>
> 22. The system of claim **19**, wherein the wire guide comprises a ring having an aperture adapted to receive the guidewire.
> . . . .
>
> 29. The method of claim **1**, wherein the wire guide is mounted on the support wire within the filter.
>
> 30. The method of claim **1**, wherein the wire guide is mounted on the support wire distal the filter.

The term "wire guide" appears throughout the remainder of the '987 Patent. For example, the Abstract provides in part: "A guided filter system for temporary placement of a filter in an artery or vein is disclosed. The system includes a guidewire slideable through a wire guide included in a distal region of a support wire." In addition, the Summary of the Invention provides in part:

> In one embodiment, the filter system comprises a guidewire and a support wire having an expandable filter, e.g., a parachute, basket, or scroll, mounted on a distal region of the support wire. . . . The distal region of the support wire includes a *wire guide*, which slideably engages the guidewire. In certain embodiments, the *wire guide* comprises a ring having an aperture adapted to receive the guidewire.
> . . . .
> In a first method of using the guided filter system, . . . the filter and the distal region of the support wire are advanced over the guidewire, having the *wire guide* of the support wire engaging the guidewire, i.e., like a monorail catheter engaging a guidewire.

'987 Patent, col. 3, ll. 9-65 (emphasis added). The term "wire guide" also appears repeatedly throughout the Brief Description of the Drawings and the Detailed Description. In the Detailed Description, the term "wire guide" is identified as a specific part: "wire guide **26**." For example, the first reference to "wire guide" reads:

> Wire guide **26** is included in distal region **11** of the support wire. The wire guide may be mounted within the filter (as shown in FIG. 1B and FIG. 1C) or at any other suitable position on support wire **10** proximal of the filter (as shown in FIG. 1E), or on a distal extension of the support wire which extends beyond the filter (as shown in FIG. 1F).

'987 Patent, col. 5, ll. 35-41. The wire guide is also specifically identified as number 26 in the related Figures 1B-1F. These figures all correspond to the description of the "first embodiment."

The '987 Patent also describes "another embodiment," in which "the filter further includes a capture sheath which covers the filter and is removeable from the filter, the sheath having a port in its distal region adapted to receive the guidewire in the manner of a rapid exchange catheter." '987 Patent, col. 5, ll. 48-51. This sheath-based embodiment is depicted in

12

Figures 1G, 1I, 1J, and 1K. In contrast to the figures depicting the "wire guide" embodiment, these figures do not include any structure designated as a "wire guide" or that corresponds to reference number 26. Instead, these figures depict embodiments using a "sheath" or a "rapid exchange catheter."

Despite the distinction between the two embodiments and the identification of "wire guide" as a particular component in reference to the "first embodiment," Boston Scientific argues that it would be improper to construe the term so as to limit it to embodiments in which the term "wire guide" explicitly appears in the specification. Instead, Boston Scientific proposes that the term "wire guide" should encompass embodiments disclosed in the '987 Patent that do not expressly refer to a "wire guide." Specifically, Boston Scientific proposes that "wire guide" should include the sheath-based embodiments depicted in Figures 1G, 1I, 1J, and 1K. The Court disagrees. As outlined above, the '987 Patent describes two distinct structures for guiding a wire over another wire: a "wire guide" and a "sheath" (or "rapid exchange catheter"). In particular, claims 1-30 recite the "wire guide" limitation and claim 31 recites the "sheath" limitation.[11] The '987 Patent also describes a "wire guide" as a specific component of the "first embodiment." The figures that include the "wire guide" are described in the patent and the "wire guide"

---

[11] In particular, claim 31 reads:

> 31. A percutaneous filter system, comprising:
> a guidewire;
> a support wire having a proximal end, a distal end, a distal region, and an expandable filter mounted on the distal region of the support wire, the support wire adapted to receive a percutaneous medical instrument; and
> a sheath which removeably covers the support wire and filter, the sheath having a proximal end, a distal end, and a distal region, the distal region having a lumen which receives the filter and an aperture adapted to pass the guidewire, wherein, during use, the guidewire is positioned in a vessel at a region of interest, the sheath carrying the support wire is advanced along the guidewire until the filter reaches the region of interest, and the sheath is withdrawn to expose the filter.

structure is labeled with reference number 26. In contrast, the '987 Patent describes "another embodiment," that includes a "sheath" or "rapid exchange catheter" with a hole in it that slides along a wire. The hole is referred to as a "port (60)," a "skive (61)," and a "skive (77)", but not a "wire guide (26)." '987 Patent, col. 5, ll. 54-57. Further, neither the figures depicting nor the portion of the detailed description relating to this second embodiment describe any structure designated with reference number 26.

Based on the claim language and the specification, it is evident that the "wire guide" and "sheath" are distinct structures. Accordingly, the Court declines to construe the term "wire guide" to encompass the sheath-based embodiments of the '987 Patent.

The Court now turns to the "mounted on" claim language. The term "wire guide mounted on the distal region" appears in independent claims 1 and 19 of the '987 Patent. In relevant part, claim 1 reads: "the support wire having a distal region, a wire guide mounted on the distal region." Claim 19 provides in pertinent part: "a wire guide mounted on the distal region of the support wire and slideably engaging the guidewire." In each claim, the language expressly indicates that the wire guide is mounted on the support wire. Boston Scientific argues that its proposed construction—"assembled on for use together with"— reflects the ordinary meaning of the words, which do not connote any sense of permanence or fixed attachment. In contrast, ev3 argues that the appearance of the phrase "mounted on" in these claims conveys a sense that the wire guide is permanently attached to the support wire.

To determine the meaning of "mounted on," the Court looks first to the intrinsic evidence. Claim 19 describes the relationships between the "wire guide" and two other components—the support wire and the guidewire. The claim language instructs that the "wire guide" is "mounted on the support wire," but "slideably engaging" the guidewire. The use of

14

two claim terms—"mounted on" versus "slideably engaging"—"in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). This inference supports a construction in which the wire guide (1) is located at a fixed position relative to the support wire, and (2) allows the guidewire to slide relative to its position.

With no strong extrinsic evidence to the contrary, the Court relies on the intrinsic evidence to conclude that the phrase "mounted on" requires fixed attachment. The Court therefore construes "wire guide mounted on the distal region" as "a part attached at a fixed position to the distal region of the support wire that has an opening for another wire to pass through so the other wire can lead the support wire to a location." The Court declines to construe the terms "wire guide" and "mounted on" independently of the Court's construction of "wire guide mounted on the distal region."

   3.   *"filter" and "filter element" (as used in the ev3 patents-in-suit)*

The terms "filter" and "filter element" appear throughout the claims of the ev3 patents-in-suit.[12] ev3 suggests that "filter" is a commonly understood term that should be construed as "a device for separating suspended particulate matter from liquid that can be made of a variety of materials." Boston Scientific disagrees and asserts that both "filter" and "filter element" as used in the ev3 patents-in-suit should be construed as "filter made of resilient metal fabric."

There are references in the specification to a filter made from a resilient metal fabric.[13]

---

[12]   Each ev3 patent-in-suit is entitled "Method and Device for Filtering Body Fluid" and is a continuation of a series of patent applications originating with a parent application filed July 8, 1994. The ev3 patents-in-suit share the same specification. Because the ev3 patents-in-suit derive from the same parent application and share many common terms, the Court interprets the claims consistently across them. *See NTP*, 418 F.3d at 1293.

[13]   For example, the Summary of the Invention refers to a metal fabric: "The present invention provides a method for forming intravascular devices from a resilient metal fabric and

15

Consistent use of a term throughout the specification can narrow a claim term. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1143-44 (Fed. Cir. 2005). In addition, when a term is characterized in the specification as part of the "present invention," it serves as strong evidence that the claims should not be read to encompass an opposite structure. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001); *see Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1313, 1318 (Fed. Cir. 2006). However, it is also well established that patent claims may cover embodiments other than those revealed in the specification. *See Phillips*, 415 F.3d at 1323 (rejecting the contention that the claims of a patent must be construed as being limited to the preferred embodiment of the specification). Here, ev3 concedes that the common specification only teaches the use of metal in connection with "filter," but argues that the claims of its patents-in-suit cover a broader range of filters. The Court agrees and determines that "filter" and "filter element" have not acquired the meaning proposed by Boston Scientific. Instead, "filter" and "filter element" are not limited to filters made of "resilient metal fabric."

Looking first to the claim language, the Court notes that the independent claims of the ev3 patents-in-suit recite a "filter" without indicating that it be comprised of any particular type of material. For example, claim 1 of the '019 Patent provides in part: "A device for filtering fluid through a lumen defined by the wall of an anatomical structure comprising: . . . a filter

---

medical devices which can be formed in accordance with this method." '103 Patent, col. 2, ll. 53-56; '019 Patent, col. 2, ll. 53-56; '375 Patent, col. 2, ll. 53-56. The Detailed Description of the Preferred Embodiments does the same:

> The present invention provides a reproducible, relatively inexpensive method of forming devices for use in channels in patients' bodies, such as vascular channels, urinary tracts, biliary ducts and the like, as well as devices which may be made via that method. In forming a medical device via the method of invention, a metal fabric 10 is provided.

'103 Patent, col. 4, ll. 32-37; '019 Patent, col. 4, ll. 32-37; '375 Patent, col. 4, ll. 28-33.

16

element carried on a distal portion of the guidewire . . . ." Similarly, the independent claims of the '375 and '103 Patents recite a "filter device," "filter element," or "filter." In contrast, the ev3 patents-in-suit also contain dependent claims that limit the "filter" to those made of "metal mesh" or "filter mesh." For example, claim 14 of the '019 Patent recites "[t]he device of claim **1** wherein the filter element comprises a metal mesh." Under the doctrine of claim differentiation, the presence of the dependent claim reciting a "metal mesh" raises the presumption that the "metal mesh" limitation is not present in the independent claim. *See Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

Although the claim-differentiation presumption here is challenged by the repeated reference to metal filters in the specification, an examination of the prosecution history supports the conclusion that the term "filter" is not limited to resilient metal fabric. The ev3 patents-in-suit are continuations of U.S. Patent No. 6,605,102 ('102 Patent). The specification of the '102 Patent is the same as the specification shared by the ev3 patents-in-suit. Unlike the claims of the ev3 patents-in-suit, however, two of the '102 Patent's independent claims recite a trap made of metal fabric.[14] The omission of the term "metal fabric" from the independent claims of the ev3 patents-in-suit supports ev3's argument that those claims are not limited to filters made of resilient metal fabric. The prosecution history also reveals that the use of both metallic and non-metallic materials in filters was well known to one of ordinary skill in the art before the ev3 patents-in-suit were granted. As part of the prior art, ev3 disclosed filters made with a wide

---

[14] Claim 1 of the '102 Patent provides "[a] trap for trapping particulate matter entrained in a fluid within a channel of a patient's body, comprising . . . a metal fabric, the metal fabric having a first end carried by the distal segment and a second end slidable along the guidewire." Claim 3 of the '102 Patent recites "[a] trap for trapping particulate material entrained in a fluid within a channel of a patient's body, comprising . . . a resilient metal fabric and a cover, the metal fabric having a first end carried by the distal segment and a second end slidable along the guidewire."

range of materials, including polyester fabric mesh, woven or braided fabric made from polymeric or natural fibers, porous membranous material, woven or braided fibers, microporous membrane or other suitable filtering or netting type material, and porous resilient fabric.

Taking into consideration the entirety of the intrinsic evidence, including the prosecution history, the Court concludes that one of ordinary skill in the art would find that the terms "filter" and "filter element" as used in the ev3 patents-in-suit are not limited to a "filter made of resilient metal fabric." Because the claim language is not limited by the specification and creates no ambiguity as to the meaning of "filter" or "filter element," the Court declines to construe the terms.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT the disputed claim terms shall be construed as set forth in this Order.

Dated:  June 19, 2007

s/ Joan N. Ericksen  
JOAN N. ERICKSEN  
United States District Judge
